IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Hattie Williams, | ) | C/A No. 0:10-004-JMC-PJG |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| Michael J. Astrue, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This social security matter is before the court for a Report and Recommendation pursuant to Local Civil Rule 83.VII.02 DSC et seq. The plaintiff, Hattie Williams ("Williams"), brought this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of a final decision of the defendant, Commissioner of Social Security ("Commissioner"), denying her claims for Disability Insurance Benefits ("DIB").

## ADMINISTRATIVE PROCEEDINGS

In November 2004, Williams applied for DIB, alleging disability beginning June 17, 2005.[1] Williams's application was denied initially and upon reconsideration, and she requested a hearing before an administrative law judge ("ALJ"). A hearing was held on February 11, 2008, at which Williams, who was represented by counsel, appeared and testified. The ALJ issued a decision on June 5, 2008 denying benefits and concluding that Williams was not disabled prior to the December 31, 2007 expiration of her insured status for purposes of entitlement to DIB benefits.

Williams was born in 1962 and was forty-five years old at the time of the ALJ's decision. She has a marginal education and past work experience as a sewing machine operator and an

---

[1] Williams initially alleged disability beginning May 16, 2001, but amended her alleged onset date at her hearing before the administrative law judge.

inspector. (Tr. 132.) Williams alleges disability since June 17, 2005 due to nerves, diabetes, thyroid problems, and poor memory. (Tr. 97, 492-93.)

The ALJ made the following findings and conclusions:

1. The claimant met the insured status requirements of the Social Security Act on December 31, 2007.

2. The claimant did not engage in substantial gainful activity during the period from her alleged onset date of June 17, 2005 through her date last insured of December 31, 2007 (20 CFR 404.1520(b) and 404.1571 *et seq.*).

3. Through the date last insured, the claimant had the following severe impairments: carpal tunnel syndrome; hypertension; diabetes mellitus; and obesity (20 CFR 404.1520(c)).

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

                          *    *    *

5. After careful consideration of the entire record, the undersigned finds that, through the date last insured, the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) with additional limitations. Specifically, she is able to lift up to 50 pounds occasionally and 25 pounds frequently. She can sit for at least 6 hours in an 8 hour workday, and stand and walk for at least 6 hours each in an 8 hour workday. She can frequently balance, stoop, kneel, and crouch, but should only occasionally climb and crawl. The claimant should avoid concentrated exposure to hazards.

                          *    *    *

6. Through the date last insured, the claimant was unable to perform past relevant work (20 CFR 404.1565).

                          *    *    *

7. The claimant was born on [Redacted], 1962 and was 45 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has a marginal education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568).

10.   Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1560(c) and 404.1566).

\*   \*   \*

11.   The claimant was not under a disability as defined in the Social Security Act, at any time from June 17, 2005, the alleged onset date, through December 31, 2007, the date last insured (20 CFR 404.1520(g)).

(Tr. 25-42.)

The Appeals Council denied Williams's request for review, making the decision of the ALJ the final action of the Commissioner.  (Tr. 7-10.)  This action followed.

## SOCIAL SECURITY DISABILITY GENERALLY

Under 42 U.S.C. § 423(d)(1)(A) and (d)(5), as well as pursuant to the regulations formulated by the Commissioner, the plaintiff has the burden of proving disability, which is defined as an "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 404.1505(a); see also Blalock v. Richardson, 483 F.2d 773 (4th Cir. 1973).  The regulations require the ALJ to consider, in sequence:

(1)   whether the claimant is engaged in substantial gainful activity;

(2)   whether the claimant has a "severe" impairment;

(3)   whether the claimant has an impairment that meets or equals the requirements of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings"), and is thus presumptively disabled;

(4)   whether the claimant can perform [her] past relevant work; and

(5)   whether the claimant's impairments prevent [her] from doing any other kind of work.

20 C.F.R. § 404.1520(a)(4). If the ALJ can make a determination that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. Id.

Under this analysis, a claimant has the initial burden of showing that she is unable to return to her past relevant work because of her impairments. Once the claimant establishes a *prima facie* case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience, and impairments, to perform alternative jobs that exist in the national economy. 42 U.S.C. § 423(d)(2)(A); see also McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983); Hall v. Harris, 658 F.2d 260, 264-65 (4th Cir. 1981); Wilson v. Califano, 617 F.2d 1050, 1053 (4th Cir. 1980). The Commissioner may carry this burden by obtaining testimony from a vocational expert. Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983).

## STANDARD OF REVIEW

Pursuant to 42 U.S.C. § 405(g), the court may review the Commissioner's denial of benefits. However, this review is limited to considering whether the Commissioner's findings "are supported by substantial evidence and were reached through application of the correct legal standard." Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); see also 42 U.S.C. § 405(g); Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987). Thus, the court may review only whether the Commissioner's decision is supported by substantial evidence and whether the correct law was applied. See Myers v. Califano, 611 F.2d 980, 982 (4th Cir. 1980). "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion; it consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Craig, 76 F.3d at 589. In reviewing the evidence, the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]." Id.

Accordingly, even if the court disagrees with the Commissioner's decision, the court must uphold

it if it is supported by substantial evidence.  Blalock, 483 F.2d at 775.

## ISSUES

Williams raises the following issues for this judicial review:

Whether the Administrative Law Judge erred in his determination that the claimant's depression and anxiety are not severe impairments.

Whether the ALJ erred in a mechanical application of the grids and failing to obtain testimony from a vocational expert, where the claimant has non-exertional impairments, functional illiteracy, and borderline IQ, all of which substantially erode her ability to perform the full range of sedentary work.

Whether the ALJ erred in failing to explain how the claimant's obesity was considered in combination with her other impairments.

(Pl.'s Br., ECF No. 6 at 1.)

## DISCUSSION

### A.    Treating Medical Source

Williams first argues that the ALJ erred in failing to find her depression and anxiety to be

severe impairments.  As part of her support for this argument, Williams contends that the ALJ erred

in failing to give controlling weight to the opinion of Dr. David Cannon,[2] a treating medical source,

which if adopted would support her assertion that her depression and anxiety are severe impairments.

Therefore, the court will first consider whether the ALJ erred in failing to give Dr. Cannon's opinion

controlling weight.

Typically, the Social Security Administration accords greater weight to the opinion of

treating medical sources because treating physicians are best able to provide "a detailed, longitudinal

picture" of a claimant's alleged disability.  See 20 C.F.R. § 404.1527(d)(2).  "If [the Commissioner]

---

[2] The ALJ's opinion references a Dr. David G. Cannon and a Dr. David F. Cannon.  It appears that this is a typographical error and that these references are to the same psychologist.

finds that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, [the Commissioner] will give it controlling weight." Id.; cf. Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992) (*per curiam*) ("Although the treating physician rule generally requires a court to accord greater weight to the testimony of a treating physician, the rule does not *require* that the testimony be given controlling weight.") (emphasis added). If controlling weight is not accorded, a treating physician's opinion is evaluated and weighed "pursuant to the following non-exclusive list: (1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005) (citing 20 C.F.R. § 404.1527). In the face of "persuasive contrary evidence," the ALJ has the discretion to accord less than controlling weight to such an opinion. Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001).

With regard to Dr. Cannon, a review of the record reveals that in June 2005 Williams was referred by a counselor to Dr. Cannon. (Tr. 224.) On June 17, 2005, Williams told Dr. Cannon that she wanted to obtain her general equivalency diploma ("GED"), but that she did not "have a mind" to do it now and had been a "slow learner" in school. (Tr. 389.) Williams also stated that, at times, she felt that someone was watching her. (Id.) On June 30, 2005, Williams complained of crying spells and a history of panic attacks. (Tr. 390.) Dr. Cannon's notes then indicate that Williams "was seen only twice, and failed to show for her last scheduled appointment." (Id.) Williams did not return to Dr. Cannon until July 2007. Dr. Cannon's treatment notes reveal that Williams saw him on seven occasions from July 11, 2007 through December 19, 2007. During these sessions, Williams

reported complaints of depression, decreased sleep, mood changes, and panic attacks. At times, Williams mentioned that she felt she was being watched and that she had avoided driving for awhile. In later sessions, Williams reported that things were "so-so." (Tr. 190-92.)

The record contains an undated Psychiatric Review Technique form completed by Dr. Cannon in which he opined that, between July 7, 2007 and October 12, 2007, Williams's affective and anxiety disorders caused marked limitations in activities of daily living, social functioning, and concentration, persistence, or pace, with no episodes of decompensation. (Tr. 193, 203.) Dr. Cannon stated that Williams appeared to suffer from a recurrent, severe, major depressive disorder without psychotic symptoms and a panic disorder with mild agoraphobia. (Tr. 205.)

In considering Dr. Cannon's opinion, the ALJ first summarized Dr. Cannon's treatment notes. The ALJ then observed that Dr. Cannon

> opined that [Williams] had marked functional limitations as a result of Major Depression and Panic Disorder. It is noted that Dr. Cannon stated that this assessment was for the period of July 11, 2007 through October 12, 2007[]. Prior to 2007, he had only seen [Williams] twice in 2005. The undersigned finds that Dr. Cannon's opinion is not consistent with the preponderance of the evidence regarding [Williams's] mental impairments. While [Williams] reported that her symptoms were due to her 2002 car accident, she did not seek treatment for them after the initial period following the accident for another 3 years. Further, as noted previously, [Williams'] allegations regarding her panic attacks are not consistent with her reported activities of daily living.

(Tr. 40.) Based on the foregoing, the ALJ did not accord significant weight to Dr. Cannon's opinion.

After the ALJ's opinion had been issued, Williams submitted a letter dated October 30, 2009 from Dr. Cannon. Dr. Cannon indicated that he had treated Williams in 2005, and again from 2007 through September 2008. Dr. Cannon stated that she was having panic attacks and "pretty severe depression to the point where her activity level was quite limited." (Tr. 487.) Dr. Cannon further opined that Williams had "some cognitive impairment akin to some kind of early dementia," but he

acknowledged that he did "not have any testing to support this impression." (Id.) He stated that she had presented with "bizarre experiences that were perhaps not overtly psychotic but did suggest some kind of psychosis." (Id.) For example, he indicated that "[s]he described periods of black-outs and extreme confusion" and that, if she was very depressed, she "would sit down and count beans just to bring herself back to some kind of reality and control." (Id.) Dr. Cannon stated that she showed elements of paranoia, such as feeling she was being watched. Dr. Cannon opined that he "felt that overall she was pretty seriously impaired." (Id.) He also stated the following:

> I think that during the time period that I treated her, it would have been very difficult for Ms. Williams to maintain the level of concentration and pace that is expected in any type of conventional work environment. She might have been able to work in some kind of sheltered work environment. Her panic attacks, depression, paranoia and confusion, all of would [sic] have greatly impacted her ability to maintain a regular work schedule and interact with others in the work place in an appropriate manner without exhibiting extreme psychological symptoms. Any kind of work environment would have been very anxiety provoking for her. For this reason, I suspect that she would have needed to leave the work station frequently due to panic attacks.

(Id.) The Appeals Council stated that it considered this additional evidence and that it did not provide a basis for changing the ALJ's decision. (Tr. 4; see also Tr. 6.)

Williams argues that the ALJ's conclusion not to accord significant weight to Dr. Cannon's opinion is not supported by the evidence and attacks some of the reasons offered by the ALJ. Specifically, Williams also contends that the ALJ erred in adopting the opinion of Dr. Ralph N. Riley, a consultative examiner, who examined Williams on one occasion immediately prior to her alleged onset date over that of Dr. Cannon, who is a licensed clinical psychologist that had over twenty hour-long sessions with Williams.[3] However, this is not the reason provided by the ALJ for

---

[3] The court observes that in reaching this number Williams appears to rely on numerous sessions after her date last insured. Based on the records before the court, it appears that Williams saw Dr. Cannon on two occasions in 2005 and seven occasions in 2007 prior to her date last insured.

rejecting Dr. Cannon's opinion.  Williams also argues that the ALJ "erroneously cit[ed] the fact that Williams had no treatment for depression from June 2005 until June 2007 and that she went for long periods between seeking treatment for depressive symptoms."  (Pl.'s Br. at 26, ECF No. 6 at 26.)

Williams appears to misconstrue the ALJ's decision.  The ALJ observed that Williams attributed her symptoms to her 2002 car accident; however, the records reveal that "she did not seek treatment for them after the initial period following the accident for another 3 years," *i.e.*, until 2005. (Tr. 40; <u>see also</u> Tr. 38.)  Further, the ALJ merely noted that Williams did not seek treatment from *Dr. Cannon* from 2005 until 2007; not that she did not seek treatment for depressive symptoms at all during that time.  In fact, the ALJ expressly stated in the opinion that Williams reported depression in September 2005 to Dr. Audrey Jones and was prescribed Zoloft; that she reported episodes of anxiety in October 2005 to Dr. Carl H. Jones and was prescribed Lorazepam; that she reported in September 2006 to Dr. Audrey Jones that the Zoloft was helping her depression; and that in October 2006 her dosage was increased.  The ALJ then stated that Williams "did not complain of depression or anxiety until July 9, 2007" when she reported to Dr. Boggs that she was experiencing depressive-like symptoms and he increased her Zoloft.  (Tr. 38; <u>see also</u> Tr. 187, 188, 332, 333.)  Based on the above, the ALJ concluded that Williams's depression was relatively well controlled beginning in September 2006.  (Tr. 39.)  While Williams points to medical records from 2005 that may indicate Williams was having difficulty with her alleged mental impairments, she has failed to point to any evidence in 2006 that would refute this finding by the ALJ.

Based on a review of the record, the parties' arguments, and the ALJ's decision, the court finds that Williams has failed to show that the ALJ's decision to reject the opinion of Dr. Cannon was not supported by substantial evidence or was controlled by an error of law.  While Williams points to pieces of evidence that may support Dr. Cannon's opinion, the court cannot say that the

ALJ's decision is not supported by substantial evidence.  See Craig, 76 F.3d at 589 (stating that the court may not "undertake to re-weigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [Commissioner]"); Pearsall v. Massanari, 274 F.3d 1211, 1219 (8th Cir. 2001) ("It is the ALJ's function to resolve conflicts among the various treating and examining physicians."); see also Stanley v. Barnhart, 116 Fed. Appx. 427, 429 (4th Cir. 2004) (unpublished) (disagreeing with the argument that the ALJ improperly gave more weight to residual functioning capacity assessments of non-examining state agency physicians over those of examining physicians and finding that the ALJ properly considered evidence provided by those physicians in context of other medical and vocational evidence).  In addition to finding that Williams's treatment records did not support Dr. Cannon's opinion, the ALJ pointed out that Dr. Cannon's opinion only pertained to a three-month period of time, which is well short of the requisite twelve consecutive months' duration requirement.   (Tr. 40); see 20 C.F.R. § 404.1505 (stating that disabling impairments must last for a continuous period of not less than twelve months or be expected to result in death); § 404.1509 (stating that the duration requirement for an impairment not expected to result in death is a continuous period of at least twelve months); § 404.1522(b) (stating that "we must also determine whether the combined effect of your impairments can be expected to continue to be severe for 12 months").  The ALJ also observed that Dr. Cannon's limitations conflicted with Williams's reported daily activities.  See  20 C.F.R. § 404.1527(d)(2) (permitting an ALJ to consider whether the medical opinion is "inconsistent with the other substantial evidence in your case record"); Oldham v. Astrue, 509 F.3d 1254, 1258 (10th Cir. 2007) (finding that an ALJ may weigh other factors brought to his or her attention that tend to support or contradict a treating physician's opinion) (quoting Watkins v. Barnhart, 350 F.3d 1297, 1301 (10th Cir. 2003)).   Finally, Dr. Cannon's opinion from 2009 essentially reiterates his earlier opinion; therefore, Williams has failed

to demonstrate how this new opinion renders the ALJ's decision unsupported. Accordingly, Williams's arguments are insufficient to show that the ALJ's decision not to give Dr. Cannon's opinion controlling weight is not supported by substantial evidence or is controlled by an error of law.

**B.      Severe Impairments**

The ALJ concluded that Williams had the following severe impairments: carpal tunnel syndrome; hypertension; diabetes mellitus; and obesity. (Tr. 25.) Williams argues that the ALJ erred in failing to find her depression and anxiety to be severe impairments.[4]

Step Two of the five-step sequential evaluation process requires the ALJ to "consider the medical severity of [a claimant's] impairment(s)." 20 C.F.R. § 404.1520(a)(4)(ii). A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). "Basic work activities" means "the abilities and aptitudes necessary to do most jobs." Examples of these include:

(1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
(2)    Capacities for seeing, hearing, and speaking;
(3)    Understanding, carrying out, and remembering simple instructions;
(4)    Use of judgment;
(5)    Responding appropriately to supervision, co-workers and usual work situations; and
(6)    Dealing with changes in a routine work setting.

20 C.F.R. § 404.1521(b). "[A]n impairment can be considered as not severe only if it is a slight abnormality which has such a minimal effect on the individual that it would not be expected to

---

[4] In Williams's reply, she appears to argue for the first time that her "borderline mental capacity" should have also been determined to be a severe impairment. (Pl.'s Reply Br. at 1, ECF No. 9 at 1.) However, this issue was not contained in the plaintiff's initial brief and is therefore not properly before the court. Williams's initial brief does argue that her borderline IQ was a nonexertional impairment that precluded the use of the Grids, and that issue is addressed below. See infra Section C.

interfere with the individual's ability to work, irrespective of age, education, or work experience."

Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal quotation marks omitted).

The ALJ found that Williams's "medically determinable mental impairments of Major Depression and Panic Disorder considered singly and in combination, do not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and are therefore non-severe." (Tr. 26.) The ALJ found that Williams had no functional limitations in her activities of daily living; social functioning; and concentration, persistence, or pace. He further found that Williams had experienced no episodes of decompensation. (Id.)

In support of her argument that the ALJ erred in failing to find that her depression and anxiety were severe impairments, Williams relies on the opinions of Dr. Rob Ronin, a state agency medical consultant, and Dr. David Cannon, a treating medical source. Williams contends that these opinions support a finding of more severe functional limitations, which if adopted would result in the conclusion that Williams's depression and anxiety are severe impairments. However, as stated above, the ALJ did not accord significant weight to Dr. Cannon's opinion and Williams has failed to demonstrate that the rejection of Dr. Cannon's opinion was not supported by substantial evidence or controlled by an error of law.

With regard to Dr. Rob Ronin, he performed a review of Williams's records on October 6, 2005. Based on his review, Dr. Ronin determined that Williams's affective and anxiety disorders caused a moderate restriction of activities of daily living; social functioning; and concentration, persistence, or pace; and no episodes of decompensation. (Tr. 167; see generally Tr. 157-70, 426-39.) With regard to specific mental work activities, Dr. Ronin opined Williams was "moderately limited" in her ability to understand, remember, and carry out detailed instructions, interact appropriately with the public, and set realistic goals or make plans independently. (Tr. 171-74, 440-

43.)  He found that she was "not significantly limited" in any other area.  (Tr. 171-72.)  Dr. Ronin

concluded that Williams had the ability to remember locations and procedures; understand and carry

out very short and simple instructions; maintain attention and concentration for extended periods;

concentrate on and persist in simple tasks; ask simple questions; interact appropriately with

supervisors and co-workers; be aware of hazards; travel in unfamiliar places and use public

transportation; and adapt to the basic demands of a work environment, although she was "not well-

suited for meeting the demands of working with the general public."  (Tr. 173.)  The ALJ rejected

this opinion, finding that it was "not supported by the updated medical records that were received

at the time of the hearing.  These records indicate that the claimant is not as limited as was found at

the time of the State Agency psychologist's evaluation."  (Tr. 41) (citing SSR 96-6p).

Williams argues that Dr. Cannon's opinion and treatment records support Dr. Ronin's

opinion and also that Williams's medical records demonstrate that she has had a pattern of

significant depression and anxiety since her alleged onset date.  However, for the same reasons

discussed above, Williams has failed to demonstrate that the ALJ's opinion is unsupported by

substantial evidence, especially in light of his finding that Williams's mental impairments were

reasonably controlled beginning in September 2006.  Accordingly, while Williams may point to

evidence to the contrary, the ALJ's findings on Williams's depression and anxiety are comfortably

within the bounds of the substantial evidence standard.

Even assuming that the ALJ erred in failing to find these conditions to be severe

impairments, reversal is not warranted on this ground.  The ALJ clearly considered Williams's

limitations with regard to her mental functioning in his residual functional capacity ("RFC")

analysis.  See Lewis v. Astrue, 498 F.3d 909, 911 (9th Cir. 2007) (stating that an ALJ's failure to

include a claimant's bursitis among his impairments at Step Two of the sequential evaluation was

harmless error because the ALJ discussed the medical evidence and limitations relating to that impairment at Step Four of the sequential evaluation); 20 C.F.R. § 404.1545(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your residual functional capacity."); § 404.1545(e) ("When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment . . . we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity."). The ALJ expressly considered in detail the examination and treatment notes concerning Williams's depression and anxiety. (Tr. 29-36, 38-39.) However, in determining Williams's RFC, he simply did not find any additional limitations were warranted in light of these impairments.

## C.     The Medical-Vocational Guidelines ("the Grids")

When the ALJ's sequential evaluation reaches Step Five, the Commissioner bears the burden of providing evidence of a significant number of jobs in the national economy that a claimant could perform. Walls v. Barnhart, 296 F.3d 287, 290 (4th Cir. 2002). To improve both the uniformity and efficiency of this determination, the Commissioner promulgated medical-vocational guidelines, located at 20 C.F.R. Part 404, Subpart P, appendix 2 (the "Grids"). Heckler v. Campbell, 461 U.S. 458, 461 (1983). The Grids consist of three "Tables," each representing a different residual functional capacity, including sedentary (Table 1), light (Table 2), and medium work (Table 3). Id. Each table then accounts for other vocational factors, including age, education, and previous work experience. For each combination of factors, the Grids provide whether the claimant is "Disabled" or "Not disabled." Id.

The Grids consider only the strength or exertional component of a claimant's disability in determining whether jobs exist that the claimant is able to perform in spite of his or her disability. Walker v. Bowen, 889 F.2d 47, 49 (4th Cir. 1989). "Exertional limitations" exist "[w]hen the limitations and restrictions imposed by [the claimant's] impairment(s) and related symptoms, such as pain, affect only [his] ability to meet the strength demands of jobs (sitting, standing, walking, lifting, carrying, pushing, and pulling)." 20 C.F.R. § 404.1569a(b). A nonexertional limitation "is a limitation that is present whether the claimant is attempting to perform the physical requirements of the job or not, such as mental retardation, mental illness, blindness, deafness or alcoholism" and is "present at all times in a claimant's life, whether during exertion or rest." Gory v. Schweiker, 712 F.2d 929, 930 (4th Cir. 1983); see also 20 C.F.R. § 404.1569a(c).

When a claimant suffers *solely* from an exertional limitation and his or her situation falls precisely within one of the Grid categories, the Grid is conclusive. 20 C.F.R. § 404.1569a(b). However, where a claimant suffers from *both* exertional and non-exertional limitations, the Grids may serve as guidelines, but are not determinative. Walker, 889 F.2d at 49 (citing Wilson v. Heckler, 743 F.2d 218 (4th Cir. 1984)); see also 20 C.F.R. § 404.1569a(d). Further, if the nonexertional limitation rises to the level that it affects the claimant's residual functional capacity to perform work even though he has the *exertional* capability to perform those jobs, then reliance on the Grids to determine whether the claimant is disabled is precluded. Rather, in those circumstances, the Commissioner has the burden to prove *by expert vocational testimony*—not the Grids—that, despite the claimant's combination of exertional and nonexertional impairments, specific jobs exist in the national economy that the claimant can perform. Grant v. Schweiker, 699 F.2d 189, 192 (4th Cir. 1983); see also Walker, 889 F.2d at 49.

As stated above, in this case, the ALJ determined that *through her date last insured*, Williams retained the RFC

> to perform medium work as defined in 20 CFR 404.1567(c) with additional limitations. Specifically, she is able to lift up to 50 pounds occasionally and 25 pounds frequently. She can sit for at least 6 hours in an 8 hour workday, and stand and walk for at least 6 hours each in an 8 hour workday. She can frequently balance, stoop, kneel, and crouch, but should only occasionally climb and crawl. The claimant should avoid concentrated exposure to hazards.

(Tr. 27.) He also found that she could not perform her past work because it involved exposure to hazards. (Tr. 41.) The ALJ found that the additional limitations imposed "had little or no effect on the occupational base of unskilled medium work" and application of the Grids was therefore appropriate. (Id.) Accordingly, pursuant to Rule 203.25[5] of the Grids the ALJ determined that Williams is not disabled.

Williams contends that the ALJ erred in solely relying on the Grids to determine that she was not disabled. In support of this argument, Williams first contends that the ALJ erred based on her previous argument that Williams suffered from severe nonexertional impairments from her depression and anxiety. However, as discussed above, the ALJ did not find any limitations from these impairments and Williams has failed to demonstrate that this decision was not supported by substantial evidence or controlled by an error of law. Therefore, this argument is without merit.

Williams next asserts that the ALJ erred in relying on the Grids based on the fact that she is "functionally illiterate." (Pl.'s Br. at 29, ECF No. 6 at 29.) Williams points out that Dr. C. David Tollison concluded that Williams is functionally illiterate and that Williams testified during the hearing that she can read "just a little bit" and requires assistance to read her mail and pay her bills.

---

[5] Rule 203.25 directs a finding of "not disabled" for a younger individual with a limited or less education, unskilled past work experience, and the maximum sustained work capacity for medium work. See 20 C.F.R. pt. 404, subpt. P, app. 2, table 2, § 203.25.

(Pl.'s Br. at 29, ECF No. 6 at 29.)  Williams then proceeds to argue that the ALJ erred in finding that she could perform medium rather than sedentary work and contends that because she is functionally illiterate and limited to sedentary work, if the Grids applied, a finding of disability would be warranted pursuant to Rule 201.17.

Rule 201.17 directs a conclusion of "disabled" when a younger individual, age 45-49, who is "[i]lliterate or unable to communicate in English" and has unskilled or no past work is limited to only sedentary work.  See 20 C.F.R. pt. 404, subpt. P, app. 2, table 1, § 201.17.  In defining illiteracy, the regulations provide that "[i]lliteracy means the inability to read or write.  We consider someone illiterate if the person cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name.  Generally, an illiterate person has had little or no formal schooling." 20 C.F.R. § 404.1564(b)(1).  In contrast, the regulations state that a "[m]arginal education means ability in reasoning, arithmetic, and language skills which are needed to do simple, unskilled types of jobs.  We generally consider that formal schooling at a 6th grade level or less is a marginal education." 20 C.F.R. § 404.1564(b)(2).  A review of the record, including the hearing transcript, reveals that Williams admitted that she could read English and write more than just her name in English.  (Tr. 130.)  She testified that she attended school through the fourth grade.  (Tr. 495.)  Williams stated that she could read "[j]ust a little bit," but also stated she could read her mail and pay some of her bills, although her daughter sometimes helped her if she did not understand something.  (Tr. 496, 497-98.)  On one questionnaire Williams indicated that she could not understand the form, so she waited to let her daughter read it to her, but indicated that she filled it out herself. (Tr. 109.)  On another questionnaire, Williams stated that no one helped her complete the form because her daughter had to work.  (Tr. 129.)  Accordingly, while Dr. Tollison may have referred to Williams as "functionally illiterate" based on the fact that Williams reads at a third-grade

level and Williams's forms may contain grammatical and spelling errors, neither of these indicate

that she is unable to read or write or "cannot read or write a simple message such as instructions or

inventory lists even though [she] can sign . . . her name." 20 C.F.R. § 404.1564(b)(1); (see, e.g.,

Tr. 109 ("I could'nt unstand this paper so I had to wait and let my Daughter read them for me but

I fill them out my self hope you all can unstand my writing"); Tr. 120 ("its hard for me to drive, mop

my floors clean my car in the inside and outside like my tires"); Tr. 128 ("I use to go every Sunday

I don't go anymore," "I use to help with the small kids I use to help servve the food"); Tr. 129

(checking a line indicating no one helped her complete the form, and writing "my daughter would

have but she have to work"); Tr. 133 ("he gave me some pills to make me sleep") (errors in

originals)); (Tr. 175 (indicating that she could spell the word "world" forward and backward but with

excessive time)).

Finally, Williams argues that the ALJ erred in applying the Grids based on her nonexertional

impairments related to her IQ score of 75. Williams relies on the holding in Grant v. Schweiker, 699

F.2d 189 (4th Cir. 1983), arguing that in this case the United States Court of Appeals for the Fourth

Circuit held that "limited intelligence, as evidenced by an IQ of 74, constitutes [a] nonexertional

impairment." (Pl.'s Br. at 32, ECF No. 6 at 32.) However, Williams appears to overextend the

holding in this case. Further, the court finds Williams's case distinguishable from Grant. In Smith

v. Schweiker, 719 F.2d 723 (4th Cir. 1984), the Fourth Circuit noted that the proper inquiry under

Grant is "whether a given nonexertional condition affects an individual's residual functional capacity

to perform work of which he is exertionally capable." Id. at 725. In the case at hand, the ALJ

observed that Dr. Tollison found that Williams had an IQ score of 75; however, he also found that

Dr. Tollison "did not specifically give any opinions regarding the claimant's functional abilities."

(Tr. 36, 40.) Further, the ALJ found that the opinions which included functional limitations were

not supported.  (Tr. 40-41.)  Williams's RFC did not include any nonexertional limitations and Williams has failed to demonstrate that she has any nonexertional limitations stemming from her IQ. See Smith, 719 F.2d 723 (stating that although claimant also suffered from depression and anxiety neurosis, his nonexertional impairments did not affect his residual functional capacity so application of the Grids was appropriate).

Thus, based on the foregoing, the ALJ's use of the Grids at Step Five as a framework to find Williams not disabled because there are jobs that she can perform with her limitations which exist in significant numbers in the national economy does not require reversal.  See Smith, 719 F.2d 723; Hoopai v. Astrue, 499 F.3d 1071, 1076-77 (9th Cir. 2007).

**D.     Obesity**

Finally, Williams briefly argues that the ALJ failed to consider Williams's obesity in determining her RFC.  Williams points out that she is morbidly obese, with a weight of 290 pounds, a height of 67 inches, and a BMI of 45.  Williams argues that although the ALJ found her obesity to be a severe impairment, he failed to "mention consideration of the impact of her obesity on her other impairments or on her residual functional capacity."  (Pl.'s Br. at 34, ECF No. 6 at 34.)

Social Security Ruling ("SSR") 02-01p states that obesity is a medically determinable impairment that an ALJ must consider in evaluating disability, that the combined effects of obesity and other impairments can be greater than the effects of each single impairment considered individually, and that obesity must be considered when assessing residual functional capacity.

Although the ALJ does not appear to have expressly examined the impact of Williams's obesity on each of her other impairments or in formulating her RFC, these omissions do not require a remand under the facts of this case.  The ALJ thoroughly discussed all of the evidence presented in this case and his RFC analysis.  For example, the ALJ specifically noted Williams's size and

diagnosis and found that her obesity was a severe impairment. (Tr. 25, 29.) Further, when considering her functional limitations, he observed objective findings including good strength and a normal gait; acknowledged that Dr. Riley suspected that most of Williams's difficulties were related to her obesity; noted Dr. Boggs's opinion that Williams was capable of performing sedentary work; and observed that in July 2006 there was "no evidence to suggest that the claimant was limited to less than a full range of sedentary work." (Tr. 29, 33, 34, 35-36, 39, 40.)

Although the ALJ ultimately found that Williams was capable of a range of medium work,[6] medium work encompasses light and sedentary work, so even assuming that the ALJ should have limited Williams to sedentary work rather than medium work due to her obesity, Williams has failed to demonstrate any harm from the ALJ's RFC assessment. (Tr. 27); Shinseki v. Sanders, 129 S. Ct. 1696, 1706 (2009) (stating in a appeal from the United States Court of Appeals for Veterans Claims concerning a veteran's disability claim that "the burden of showing that an error is harmful normally falls upon the party attacking the agency's determination"); Ngarurih v. Ashcroft, 371 F.3d 182, 190 n.8 (4th Cir. 2004) ("While the general rule is that an administrative order cannot be upheld unless the grounds upon which the agency acted in exercising its powers were those upon which its action can be sustained, reversal is not required when the alleged error clearly had no bearing on the procedure used or the substance of the decision reached.") (citations and internal quotation marks omitted); Allen v. Barnhart, 357 F.3d 1140, 1145 (10th Cir. 2004) (noting that the principle of harmless error applies to Social Security disability cases). There is no indication that limiting Williams to sedentary work would result in a disability finding based on the Grids. See 20 C.F.R. pt. 404, subpt. P, app. 2, table 1. Accordingly, the court finds that reversal is not warranted on this

---

[6] This finding was supported by the assessments the state agency physicians, who also specifically considered Williams's obesity. (Tr. 144-47, 150-53.)

ground.  See SSR 02-01p (providing that "we will not make assumptions about the severity or

functional effects of obesity combined with other impairments.  Obesity in combination with another

impairment may or may not increase the severity or functional limitations of the other impairment.

We will evaluate each case based on the information in the case record.").

## RECOMMENDATION

For the foregoing reasons, the court finds that Williams has failed to show that the

Commissioner's decision was unsupported by substantial evidence or reached through application

of an incorrect legal standard.  See Craig, 76 F.3d at 589; see also 42 U.S.C. § 405(g); Coffman, 829

F.2d at 517.  The court therefore recommends that the Commissioner's decision be affirmed.

Paige J. Gossett
UNITED STATES MAGISTRATE JUDGE

February 2, 2011
Columbia, South Carolina

*The parties' attention is directed to the important notice on the next page.*

### Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  Diamond v. Colonial Life & Acc. Ins. Co., 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); see Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); Thomas v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).